## Commonwealth *vs.* Roy L. Hunt.

Plymouth. March 8, 2012. - July 16, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, & Duffly, JJ.

*Sex Offender. Constitutional Law,* Sex offender, Self-incrimination, Freedom of speech and press. *Evidence,* Sex offender, Prior violent conduct, Sexual conduct. *Jury and Jurors. Practice, Civil,* Sex offender, Instructions to jury.

At the trial in Superior Court of a petition seeking the civil commitment of the defendant as a sexually dangerous person, the judge erred in admitting evidence that the defendant refused to participate in sex offender treatment programs, where, although the defendant's participation in such treatment was not compelled in a constitutional sense by the possible evidentiary use of his refusal at a trial adjudicating whether he is sexually dangerous, the risk of unfair prejudice arising from such evidence substantially exceeded its probative value, especially where the jury may properly learn that the defendant did not receive such treatment [809-820]; moreover, this error, when considered together with the judge's erroneous admission of an unsubstantiated rumor that the defendant had sexually assaulted another inmate [821-824], as well as the prosecutor's improper closing argument regarding the defendant's "sexual frustration" from his time in prison and the judge's errors in instructing the jury on the elements of mental abnormality, the likelihood of engaging in sexual offenses, and proof beyond a reasonable doubt [824-826], required reversal of the judgment of sexual dangerousness, the setting aside of the jury verdict, and a new trial.

At the trial in Superior Court of a petition seeking the civil commitment of the defendant as a sexually dangerous person, the judge did not abuse his discretion in excusing for cause a prospective juror who expressed his belief that no medical expert could conclusively demonstrate whether the defendant would commit another sexual offense, where the judge rested his decision on his informed judgment that the juror had decided to reject the opinions of the Commonwealth's expert witnesses before hearing their testimony and therefore could not be a fair and impartial juror. [820-821]

Civil action commenced in the Superior Court Department on June 4, 2004.

The case was tried before *Jeffrey A. Locke,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Brandon L. Campbell* for the defendant.

*Christine M. Kiggen*, Assistant District Attorney, for the Commonwealth.

*Michael F. Farrington*, pro se, amicus curiae, submitted a brief.

GANTS, J. A Superior Court jury found the defendant to be a sexually dangerous person (SDP) as defined in G. L. c. 123A, § 1, and he was ordered committed to the Massachusetts Treatment Center (treatment center) for an indeterminate period of from one day to life. On appeal, he claims that the trial judge erred in (1) denying his motion in limine to exclude any reference to his failure to participate in sex offender treatment programs made available to him by the Department of Correction (department); (2) excusing a prospective juror for cause who expressed his belief that no medical expert could conclusively demonstrate whether the defendant is going to commit another sexual offense; (3) admitting evidence that the defendant feared for his safety in prison because of rumors that he had sexually assaulted another inmate; and (4) instructing the jury regarding the elements of mental abnormality and the likelihood of engaging in sexual offenses, and in describing proof beyond a reasonable doubt. The defendant also claims that the prosecutor made improper and inflammatory remarks in closing argument that created a substantial risk of a miscarriage of justice. We conclude that there were errors in the admission of evidence and in the judge's instructions of law that, when considered together with the improprieties in the prosecutor's closing argument, require reversal and a new trial.[1]

*Background.* On December 3, 1990, the defendant pleaded guilty to three indictments charging rape of a child and an unrelated indictment charging unarmed burglary, and he was sentenced to from eight to fifteen years in State prison on each of the indictments, to be served concurrently. At the plea hearing, the defendant admitted that he had been the live-in boy friend of the victim's mother for many years. When the victim was approximately seven years old, he began fondling her chest, and when she was approximately ten years old he raped her once or twice each week. The rape indictments to which he

---

[1] We acknowledge the amicus brief submitted by Michael F. Farrington.

pleaded guilty occurred when the victim was between the ages of twelve and fourteen, the last occurring shortly after she had moved out of her mother's home.

On June 4, 2004, the Commonwealth filed a petition under G. L. c. 123A, § 12, seeking civil commitment of the defendant as an SDP. On June 17, a judge in the Superior Court temporarily committed the defendant to the treatment center pursuant to G. L. c. 123A, § 12 (*e*). After a hearing on September 18, 2007, a judge found probable cause to support the petition. At trial, the Commonwealth offered the testimony of two qualified examiners, and a third designated forensic psychologist, each of whom opined that the defendant is appropriately diagnosed with pedophilia, has a mental abnormality as defined in G. L. c. 123A, § 1, and is likely to commit further sexual offenses if not confined.

The defendant offered the testimony of three licensed psychologists, each of whom agreed that the defendant met or may meet the criteria for a diagnosis of pedophilia under the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000), but opined that the defendant is not likely sexually to reoffend. Two of the defense experts opined that the defendant did not have a mental abnormality as defined in the statute; one opined that he did. On June 3, 2008, a jury found the defendant to be an SDP. The defendant appealed, and the Appeals Court affirmed the judgment. *Commonwealth* v. *Hunt*, 79 Mass. App. Ct. 344 (2011).[2] We granted the defendant's application for further appellate review.

*Discussion.* 1. *Admission of evidence of the defendant's refusal to participate in sex offender treatment programs.* While in prison serving his sentence and in the treatment center awaiting trial on the SDP petition, the defendant was offered the opportunity to participate in sex offender treatment programs provided by the department if he agreed in writing to the conditions of such treatment. In 1994, he was offered treatment that included "a period of self-guided treatment, assessment and education, followed by group therapy utilizing the Relapse

---

[2]The record does not indicate why it took four years to reach a final disposition of the petition or three years to affirm the judgment, and the defendant does not raise the issue.

Prevention Model" conducted by a "sex offender therapist." As a condition of such treatment, he was required to sign an agreement giving his sex offender therapist "permission to share information concerning [his] progress in treatment and other pertinent evaluative information" with the department and the parole board. He declined to sign the agreement. In 2003, he was again offered comparable treatment if he executed an agreement that, among other conditions, gave his sex offender therapist "permission to share information concerning [his] progress in treatment and other pertinent evaluative information" with the department, parole board, and the probation department, the district attorney, and "any other law enforcement agencies." He again declined. In June, 2004, after he was temporarily committed to the treatment center, he was offered unspecified treatment if he agreed in writing that nothing he said or disclosed in treatment or in discussions with his therapist would be confidential and that such information may be reviewed by qualified examiners and other evaluators to determine whether he was an SDP. He again declined.

Before trial, the defendant moved in limine to bar any reference to the defendant's failure to participate in the sex offender treatment programs, claiming that admission of this evidence would violate his rights under the First and Fifth Amendments to the United States Constitution, as applied to the States through the due process clause of the Fourteenth Amendment to the United States Constitution, and under the Massachusetts Declaration of Rights.[3] The judge denied the motion and overruled the defendant's objections when the evidence was offered at trial. The essence of his argument is that sex offender treatment programs require participants to admit and discuss their prior sexual offenses, including uncharged sexual offenses, based on the premise that such admissions are a necessary step in the rehabilitation of sex offenders. See *Ainsworth* v. *Risley*, 244 F.3d 209, 215 (1st Cir. 2001), vacated sub nom. *Ainsworth* v. *Stanley*, 536 U.S. 953, aff'd on reh'g, 317 F.3d 1 (1st Cir. 2002), cert. denied, 538 U.S. 999 (2003) ("The program's

---

[3] The defendant in his motion in limine also claimed that such evidence is inadmissible because it is not relevant to the question of sexual dangerousness, but he does not press this claim on appeal.

requirement that participants admit to their crimes is widely believed to be a necessary prerequisite to successful treatment"); Shevlin, "[B]etween the Devil and the Deep Blue Sea": A Look at the Fifth Amendment Implications of Probation Programs for Sex Offenders Requiring Mandatory Admissions of Guilt, 88 Ky. L.J. 485, 485 (1999-2000).[4]

Where, as here, a sex offender is required to waive the confidentiality of statements made in treatment to a sex offender therapist in order to obtain treatment, the sex offender is faced with a problematic choice. If he agrees to waive confidentiality and seek treatment, all that he admits during treatment, including past sexual offenses, may be used against him, whether to prosecute him for offenses that have yet to be adjudicated, to deny him early release on parole, or to show that he is an SDP who must be civilly committed to prevent future sexual offenses. If he avoids incriminating himself by refusing to waive confidentiality, he is denied any sex offender treatment, and his refusal to enter treatment may be admitted in evidence and used by the qualified examiners and the Commonwealth's expert witnesses, as it was here, to support their opinion that he is an SDP.

The defendant contends that the admission in evidence of his refusal of treatment violates his privilege against compelled self-incrimination under the Fifth and Fourteenth Amendments and art. 12 of the Massachusetts Declaration of Rights because the admission of such evidence constitutes a penalty to compel testimony that has not been immunized. We are not persuaded by the defendant's constitutional claim.

The prohibition against self-incrimination "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' " *Minnesota* v. *Murphy*,

---

[4]Dr. Ira Silverman, the consulting forensic psychologist called by the Commonwealth to testify at trial, stated that those who refused to "own" their prior sexual offenses after the preliminary stages of a sex offender treatment program would be dismissed from the program because a relapse prevention plan cannot be prepared unless the offender acknowledges his commission of past sexual offenses.

465 U.S. 420, 426 (1984), quoting *Lefkowitz* v. *Turley*, 414 U.S. 70, 77 (1973). "A defendant does not lose this protection by reason of his conviction of a crime." *Minnesota* v. *Murphy, supra.* Even if a defendant is imprisoned when he makes incriminating statements, "if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." *Id.*

The United States Supreme Court has recognized that an incriminating statement need not be ordered by a court to be "compelled": a statement may be deemed "compelled" where the penalties for the defendant refusing to incriminate himself are so severe that they are "capable of coercing incriminating testimony." *McKune* v. *Lile*, 536 U.S. 24, 49 (2002) (O'Connor, J., concurring in the judgment) (*McKune*). See *Minnesota* v. *Murphy, supra* at 434, quoting *Lefkowitz* v. *Cunningham*, 431 U.S. 801, 806 (1977) (surveying cases in which Court found compulsion where State sought to induce individual "to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids' ").

Where an incriminating statement is found to be "compelled," the individual faced with the dilemma of incriminating himself or suffering the penalties of silence has one of two judicial remedies. If the individual refuses to make the incriminating statements, he is entitled to protection from the imposition of the penalties arising from the refusal. See *Lefkowitz* v. *Cunningham, supra* at 806; *Uniformed Sanitation Men Ass'n* v. *Commissioner of Sanitation of N.Y.*, 392 U.S. 280, 284-285 (1968); *Gardner* v. *Broderick*, 392 U.S. 273, 279 (1968). If the individual makes the incriminating statement to avoid the penalties, he is entitled to immunity to protect against the incriminating use of the statement. See *Garrity* v. *New Jersey*, 385 U.S. 493, 500 (1967); *Sher* v. *United States Dep't of Veterans Affairs*, 488 F.3d 489, 502 (1st Cir. 2007), cert. denied, 552 U.S. 1309 (2008). Federal constitutional law requires use immunity — the statements may not be used against the individual directly or indirectly in a future criminal proceeding. *Gardner* v. *Broderick, supra* at 276. Under Massachusetts law, art. 12 "requires transactional immunity to supplant the privilege against self-incrimination."

*Carney* v. *Springfield*, 403 Mass. 604, 610 (1988). See *Commonwealth* v. *Dormady*, 423 Mass. 190, 198 (1996) ("we are not disposed to throw aside the long-standing jurisprudence of this Commonwealth and accept the concept of use immunity").

Here, where the defendant refused sex offender treatment and therefore avoided the need to make incriminating statements about his sexual history, the remedy the defendant seeks is to be protected at his SDP civil commitment proceeding from any reference to his failure to accept sex offender treatment. Pragmatically, this would bar not only the admission of evidence that he refused treatment, but also any reference to his refusal or failure to undergo sex offender treatment by the qualified examiners or the Commonwealth's expert witnesses in offering their opinion that the defendant is an SDP.

The defendant would be entitled to such relief here only if the potential use at his SDP civil commitment proceeding of his refusal to accept sex offender treatment is so severe a penalty for his refusal to incriminate himself that he should be deemed "compelled" to accept admission to sex offender treatment. See *McKune, supra* (O'Connor, J., concurring in the judgment). The United States Supreme Court has held that incriminating statements are "compelled" where the refusal to self-incriminate mandates a penalty of termination of employment, see *Uniformed Sanitation Men Ass'n* v. *Commissioner of Sanitation of N.Y., supra* at 284; loss of a professional license, see *Spevack* v. *Klein*, 385 U.S. 511, 519 (1967); ineligibility to receive government contracts, see *Lefkowitz* v. *Turley, supra* at 84-85; or the loss of the right to participate in private, voluntary political associations and hold public office. See *Lefkowitz* v. *Cunningham, supra* at 807-808. More recently, the Supreme Court held that a convicted sex offender's participation in a prison sexual abuse treatment program where he is required to "complete a sexual history form, which details all prior sexual activities, regardless of whether such activities constitute uncharged criminal offenses," without the benefit of any protection from the use of this incriminating information in a criminal proceeding, is not compelled even though his refusal to participate results in the automatic curtailment of his visitation rights and other prison privileges and requires his transfer to a maximum security unit

where he would move from a two-person to a four-person prison cell. *McKune, supra* at 30-31 (plurality opinion).[5] See *Ainsworth v. Stanley*, 317 F.3d 1, 3 (1st Cir. 2002), cert denied, 538 U.S. 999 (2003) (participation in New Hampshire's sex offender treatment program not compelled where nonparticipation results in transfer to less desirable housing and "almost always results in an inmate being denied parole").

The Supreme Court has yet to decide whether the risk that a prisoner's refusal to enter sex offender treatment will be considered at an SDP civil commitment proceeding is so severe a penalty for his refusal to incriminate himself as to constitute compelled self-incrimination. But we conclude that this risk falls well short of the severity of penalty necessary to constitute compulsion in violation of the Fifth and Fourteenth Amendments. Where the Supreme Court has found compulsion, the severe penalty that compelled the self-incrimination was automatically imposed upon the refusal to self-incriminate. See, e.g., *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977); *Gardner v. Broderick, supra* at 275 n.3. In *McKune, supra* at 60 (Stevens, J., dissenting), the four dissenting Justices who concluded that the prison sanctions imposed for refusing to participate in the sex offender treatment program compelled the sex offender's self-incrimination noted that the "penalty for refusing to participate . . . is automatic." The dissent continued, "Instead

---

[5]The plurality opinion in *McKune v. Lile*, 536 U.S. 24, 37 (2002) (*McKune*), quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995), concluded that incriminating statements by a prisoner are not "compelled" where the penalties for refusal to self-incriminate do not constitute "atypical and significant hardships on [inmates] in relation to the ordinary incidents of prison life." Justice O'Connor in her concurring opinion did not agree that the standard for compulsion is the same as the due process standard established in *Sandin v. Conner, supra*, and "[found] the plurality's failure to set forth a comprehensive theory of the Fifth Amendment privilege against self-incrimination troubling." *McKune, supra* at 53-54 (O'Connor, J., concurring in the judgment). But she, too, concluded that the consequences of refusing sex offender treatment were not so serious as to "compel" the prisoner's incrimination "on any reasonable test." *Id.* at 50, 54. Because no single rationale obtained the support of a majority of the sitting Justices, the Court's holding is the "position taken by those Members who concurred in the judgments on the narrowest grounds," which means that Justice O'Connor's concurrence constitutes the holding of the Court. *Ainsworth v. Stanley*, 317 F.3d 1, 4 (1st Cir. 2002), cert. denied, 538 U.S. 999 (2003), quoting *Marks v. United States*, 430 U.S. 188, 193 (1977), and cases cited.

of conjecture and speculation about the indirect consequences that may flow from a decision to remain silent, . . . . [t]he penalty involved in this case is a mandated official response to the assertion of the privilege." *Id.* (Stevens, J., dissenting). Here, there is no mandatory penalty arising from the refusal to participate. Rather, the prisoner faces the possibility that, if the Commonwealth subsequently seeks civilly to commit the prisoner as an SDP, it may offer the refusal in evidence or the qualified examiners or the Commonwealth's expert witnesses may refer to it as supporting their opinion that the defendant is an SDP.

In addition, in *Baxter v. Palmigiano,* 425 U.S. 308, 317 (1976), where a prisoner. was informed that he could remain silent at his disciplinary hearing but that his silence could be used against him, the Supreme Court held that the prisoner was not compelled to incriminate himself. In reaching this conclusion, the Court noted that his silence was not being used against him in a criminal proceeding and that his silence was insufficient alone to support an adverse disciplinary decision. *Id.* The Court added that giving "evidentiary value" to his silence "does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege." *Id.* at 318. Here, the defendant's refusal to participate in sex offender treatment is not being used against him in a criminal proceeding; his refusal is insufficient alone to support a finding of sexual dangerousness, and the Commonwealth is merely giving "evidentiary value" to his refusal. In these circumstances, we conclude that under the Fifth and Fourteenth Amendments the defendant's participation in sex offender treatment is not compelled by the possible evidentiary use of his refusal at a trial adjudicating whether he is sexually dangerous.[6]

We recognize that we have held that the right against self-incrimination under art. 12 is broader than that under the Fifth Amendment. See, e.g., *Commonwealth* v. *Mavredakis,* 430 Mass.

---

[6]The defendant's claim under the First Amendment to the United States Constitution is also premised on a violation of his right not to be compelled to speak. See *Washington Legal Found.* v. *Massachusetts Bar Found.,* 993 F.2d 962, 976 (1st Cir. 1993) ("The First Amendment protects the right not to speak or associate, as well as the right to speak and associate freely"). Therefore, our conclusion that the defendant's participation in sex offender treatment was not compelled disposes of his First Amendment claim.

848, 859 (2000); *Opinion of the Justices*, 412 Mass. 1201, 1210-1211 (1992). "[W]here Federal law is insufficient to protect the broader rights against self-incrimination guaranteed by art. 12, we have adopted additional rules under the Massachusetts Constitution to secure those rights." *Commonwealth* v. *Simon*, 456 Mass. 280, 291, cert. denied, 131 S. Ct. 181 (2010). We need not decide here whether art. 12 jurisprudence follows Federal law in determining whether the Commonwealth has compelled a statement. To decide this case, it suffices that we conclude that the possibility that evidentiary use will be made of a defendant's refusal to participate in sex offender treatment does not constitute compulsion of such treatment in violation of art. 12. See *Commonwealth* v. *Delisle*, 440 Mass. 137, 143-144 (2003) (where probation of defendant in batterers' program was not revoked solely because he refused to write letter to his wife detailing his prior abuse, defendant was not compelled to incriminate himself by writing letter); *Commonwealth* v. *Brescia*, 61 Mass. App. Ct. 908, 908-909 (2004) (even if participation in sex offender treatment program would have required defendant to incriminate himself, no compulsion where "there is nothing in the record before us to show that any refusal would result automatically in the revocation of his probation"). Because we find no compulsion, where a defendant agrees to enter such a treatment program and waive confidentiality, we conclude that a defendant is not entitled to transactional immunity for any sexual offense he reveals during treatment. Therefore, we conclude that reference at trial to the defendant's refusal to participate in sex offender treatment did not violate his rights under either the United States Constitution or the Massachusetts Declaration of Rights.

Although we find no constitutional violation, we recognize under our common law of evidence the potential for unfair prejudice arising from the admission of evidence at an SDP civil commitment proceeding that the defendant refused sex offender treatment. Although the record does not describe the sex offender treatment the defendant was offered, the consent forms he was asked to sign describe it as a form of psychological therapy, including group therapy, conducted by a "sex offender therapist." In *Jaffee* v. *Redmond*, 518 U.S. 1, 12, 15 (1996), the

Supreme Court recognized a psychotherapist-patient privilege, joining the fifty States and the District of Columbia in doing so, and extended the privilege to include licensed social workers who provide psychotherapy. The Court recognized the importance of confidentiality to clinical therapy, noting the "wide agreement that confidentiality is a sine qua non for successful psychiatric treatment." *Id.* at 10, quoting Advisory Committee's Notes to Proposed Rules, 56 F.R.D. 183, 242 (1972). The Court declared:

> "Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment."

*Id.* at 10. "If the privilege were rejected, confidential conversations between psychotherapists and their patients would surely be chilled, particularly when it is obvious that the circumstances that give rise to the need for treatment will probably result in litigation." *Id.* at 11-12.

Our Legislature has recognized the importance of confidentiality in communications between patients and psychotherapists, licensed social workers, and allied mental health professionals (including licensed marriage and family therapists, licensed rehabilitation counselors, licensed educational psychologists, and licensed mental health counselors) by enacting statutes declaring such communications confidential and protecting their confidentiality with an evidentiary privilege. See G. L. c. 112, § 129A, and c. 233, § 20B (psychologists and psychotherapists); G. L. c. 112, §§ 135A, 135B (licensed social workers); G. L. c. 112, § 172 (allied mental health professionals).[7] See

---

[7]The grant of confidentiality is not absolute and includes various exceptions, such as where information is disclosed in therapy to a psychotherapist, licensed social worker, or allied mental health professional that a child is being sexually abused. See G. L. c. 119, § 51A (*a*), (*j*).

also G. L. c. 233, § 20J (communications between sexual assault victim and sexual assault counsellor). Although the record does not reveal whether the "sex offender therapist" met the definition of a psychotherapist, licensed social worker, or allied mental health professional, we have no reason to believe that the confidentiality of communications is less important in providing sex offender therapy than in providing other forms of clinical therapy.

Yet, the sex offender treatment offered to the defendant was conditioned on his agreement to waive any entitlement to confidentiality, and provided notice that the statements made by the prisoner during treatment, including the most potentially incriminating statements regarding his sexual conduct, proclivities, and thoughts, would be made available to those who may choose to use such statements to prosecute him for past sexual crimes, deny him parole, or commit him indefinitely as an SDP. The required waiver of confidentiality not only poses a substantial risk that a prisoner's statements during sex offender treatment will be used against him at a criminal trial, parole hearing, or SDP civil commitment proceeding but also, if sex offender therapy is akin to psychotherapy, is likely to impede the development of an atmosphere of confidence and trust, chill the candor of communication, and diminish the likelihood of successful treatment. See *Jaffee* v. *Redmond, supra* at 10-12.

Because sex offender treatment without confidentiality is so laden with risk for the sex offender and the relationship of trust between therapist and sex offender so compromised, we draw a distinction between a prisoner not receiving sex offender treatment and a prisoner's refusal of such treatment. At an SDP civil commitment proceeding, a qualified examiner or the Commonwealth's expert witness may offer the opinion — assuming it is sufficiently supported by empirical evidence — that those who receive or complete sex offender treatment are less likely sexually to reoffend than those who do not.[8] If sex offender treatment has been shown to reduce sexual recidivism, what is relevant is whether a defendant received such treatment as a prisoner, not why he did not. It does not matter whether the

---

[8]The defense's expert witness, of course, may challenge this opinion based on other empirical evidence.

failure to obtain treatment arises from the unavailability of treatment at the facility where the prisoner is held or from the refusal by the prisoner to enroll in treatment. If supported by empirical evidence, we do not find this opinion to be unfairly prejudicial.

But if a jury were to learn that a defendant refused sex offender treatment as a prisoner, they may infer from the refusal that the defendant does not wish to be treated for sexual problems. Where sex offender treatment is conditioned on a waiver of confidentiality, refusal of treatment alone is insufficient to support an inference that the prisoner does not want to be treated. If the Commonwealth were to provide sex offender therapy without requiring a waiver of confidentiality, then this inference arising from refusal would be fair and reasonable.[9] Therefore, although evidence that a defendant in an SDP civil commitment proceeding did not receive sex offender treatment is admissible, we conclude that it is error to admit evidence that a defendant refused sex offender treatment where he could receive such treatment only by waiving confidentiality.[10] The risk of unfair prejudice arising from such evidence substantially exceeds its probative value, especially where, as just stated, the jury properly may learn that the defendant did not receive sex offender treatment.

[9]See *Ainsworth* v. *Risley*, 244 F.3d 209, 220 (1st Cir. 2001), vacated sub nom. *Ainsworth* v. *Stanley*, 536 U.S. 953, aff'd on reh'g, 317 F.3d 1, 5 (1st Cir. 2002), cert. denied, 538 U.S. 999 (2003) (noting that "[s]ome states address the incrimination dilemma posed by sex offender treatment programs by asking inmates seeking treatment only to admit to misconduct of which law enforcement officials are already aware" and some courts have suggested that "states grant use immunity to sex offenders before requiring them to disclose past misconduct during the course of treatment"). We note that the New Jersey Department of Human Services has promulgated a regulation providing that "[c]onfidential relations between and among mental health practitioners and [inmates] or groups in the course of practice are privileged communications and not to be disclosed to any person." N.J. Admin. Code § 10A:16-4.4(a) (2010). The regulation provides exceptions to confidentiality where the communications "present a clear and imminent danger to the inmate or others." *Id.* at § 10A:16-4.4(b).

[10]It would also be error to admit evidence offered by the Commonwealth, either directly or through the opinion testimony or report of a qualified examiner or expert, that would strongly suggest a defendant's refusal of sexual offender treatment, such as evidence that treatment was made available to a defendant who did not receive sex offender treatment.

Therefore, we conclude that the judge erred in admitting evidence that the defendant refused sex offender treatment and should have allowed evidence only that the defendant did not receive such treatment. We recognize that the judge may not reasonably be faulted for this error because we have not before considered this issue or drawn this evidentiary distinction between not receiving treatment and refusing treatment.

2. *Excusal of prospective juror for cause.* During voir dire of the venire, a prospective juror declared that he had two biases:

> "[O]ne, I think that the Massachusetts law is too lenient in these cases; two, I don't think the medical community has the facilities to prove one way or the other, to rehabilitate or not."

The juror assured the judge that he would not have trouble following the law as the judge instructed, even if he were to disagree with it. The judge told the juror that his "views on the state of medical science" would not disqualify him as a juror unless they would cause him automatically to reject any opinion by a medical expert. The juror explained:

> "I don't think it's so much that I would reject an opinion as it is, that I don't think that they can demonstrate one way or another whether or not this guy's going to repeat the crime or not. . . . I just don't think their opinions relate to anything that's conclusive. . . . I don't think that they really can prove one way or the other if . . . he's going to repeat or not unless they demonstrate that they . . . repeat the behavior of doing it."

The judge, in conferring with the attorneys after the juror had stepped back, said that his "sense" was that the juror "would handicap the Commonwealth" in its reliance on psychological opinion testimony because the juror "does not believe that the psychological community can predict future behavior and that . . . belief would almost lead automatically" to the juror finding the defendant not to be sexually dangerous. Defense counsel said that he thought the juror was "expressing a healthy skepticism about the testimony in this case." The judge responded, "It's not skepticism; it's rejection is what I'm hearing." The

judge, over defense objection, excused the prospective juror for cause, stating that he did not "believe on the science opinion that he can be fully fair to the Commonwealth" and that he could not be "satisfied that he could be fully fair and impartial to both sides."

We give great deference to a judge's decision to excuse a prospective juror for cause during empanelment, because a judge who has spoken directly with the juror is better positioned than we are to evaluate the juror's credibility and impartiality. See *Commonwealth* v. *Dupont*, 75 Mass. App. Ct. 605, 607-608 (2009). We review the decision for abuse of discretion. See *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 442-443 (2001); *Commonwealth* v. *Ascolillo*, 405 Mass. 456, 460-461 (1989). We conclude that the judge did not abuse his discretion in excusing this juror. The judge properly recognized that a "healthy skepticism" of the ability of experts to predict future sexual recidivism did not justify excusing the juror for cause. He rested his decision on his informed judgment that the prospective juror had decided to reject the opinions of the Commonwealth's expert witnesses before hearing their testimony and therefore could not be a fair and impartial juror.

3. *Admissibility of rumors that the defendant had sexually assaulted another inmate.* Before trial, the defendant filed a motion in limine to exclude references to false rumors circulating within the prison suggesting that he sexually assaulted another inmate. The defendant had reported the rumors in correspondence to the department because he wanted to remain in protective custody and had challenged the disciplinary reports he received for refusing an order to return to the general prison population. The judge reserved his decision on the motion until trial.

During the cross-examination of one of the qualified examiners, Dr. Michael Murphy, defense counsel asked whether the defendant's disciplinary reports could fairly be characterized as "technical or minor in nature." Dr. Murphy stated that the disciplinary reports primarily involved the defendant's refusal to "go into population settings that he was ordered to go into." Defense counsel asked if the records showed that the defendant had complained that he feared for his safety in prison. Dr. Murphy replied in the affirmative and stated that the defendant had

cited reasons why "he felt that he was in more danger in the general population of assault by other inmates, so he refused to go into the population resulting in a disciplinary report . . . ." At a subsequent sidebar, the prosecutor argued that this exchange had "opened the door" for her to inquire into the basis of the defendant's fear and solicit evidence regarding the prison rumors that he had raped another inmate. Over the defendant's objection, the judge agreed, finding that G. L. c. 123A, § 14 (c), which allows the admission of prison "incident reports," required the admission of testimony about the rumor. On redirect examination, the prosecutor elicited from Dr. Murphy that the defendant in correspondence stated he believed he had been targeted for assault by other inmates because "he had been accused . . . within the inmate population of having sexually assaulted another inmate."

The defendant claims that the judge abused his discretion in admitting in evidence this unsubstantiated rumor. We agree. The judge recognized that the only reference to a rumor that the defendant had raped another inmate came from the defendant; there was no report of a rape from any other source and no suggestion that the prison had investigated the allegation or made a determination as to the truth of the allegation. But the judge appeared to believe that he was bound by our decision in *Commonwealth* v. *Markvart*, 437 Mass. 331 (2002), to admit evidence of these rumors because they were mentioned in prison incident reports that are admissible in evidence in SDP civil commitment proceedings under G. L. c. 123A, § 14 (c).[11] We conclude that the disclosure of these rumors was not contained in an incident report and is not admissible in evidence.

An "incident report" is not defined in G. L. c. 123A or the department's regulations, but we can discern its meaning from the term itself, the context in which it is used in the department's policies, and our case law. An "incident" is "a definite and separate occurrence; an event." American Heritage Dictionary 886 (4th ed. 2006). A "report" is "[a]n account presented usu-

---

[11]General Laws c. 123A, § 14 (c), states, in relevant part: "[I]ncident reports arising out of such person's incarceration or custody . . . shall be admissible at the trial if such written information has been provided to opposing counsel reasonably in advance of trial."

ally in detail." *Id.* at 1480. Under the department's written policy, "[a]ll allegations and incidents of inmate on inmate . . . sexually abusive behavior shall immediately be reported by Department employees, contractors and volunteers to the shift commander verbally and followed up with a confidential incident report to the Superintendent before the end of his/her shift." 103 DOC § 519.03 (2011). From the dictionary definition of these words and their use in this department policy, it is plain that an incident report is a written report of an event or allegation prepared by a correction employee, contractor, or volunteer. We have also understood incident reports to be descriptions of specific events prepared by correction officers who investigated the events. In *McHoul, petitioner,* 445 Mass. 143, 150 (2005), cert. denied, 547 U.S. 1114 (2006), we noted that incident reports "may contain the reporting officer's own observations," admissions by the person charged with the incident, "statements of other inmate witnesses, or information supplied by other correctional officers investigating the incident."

Here, the defendant's references to these rumors were contained in his own correspondence and appeals from disciplinary sanctions and classification determinations. They were not contained in any incident report written by correction officers, contractors, or volunteers. There was neither an incident nor a report. Because this information was not contained within an incident report or any other category of document that is admissible under G. L. c. 123A, § 14 (*c*), it could only be admissible under our common-law rules of evidence. See *Commonwealth v. Markvart, supra* at 335. Unsubstantiated rumors of rape that, as here, would be relevant only if offered for their truth are plainly not admissible under our rules of evidence.[12] See *Com-*

---

[12]The Commonwealth argues that these rumors became admissible because defense counsel "opened the door" to such testimony in his cross-examination of Dr. Murphy, and the admission of the rumors was needed to prevent the jury from being left with "a false impression." Defense counsel's questioning left no such false impression. He merely elicited from Dr. Murphy that the defendant's refusal to comply with orders to be transferred to the general prison population arose from the defendant's fear that he would be assaulted by other inmates. The reason why he was in fear was irrelevant to any issue at trial and needlessly invited the risk that the jury would consider the possibility that the rumors of inmate rape were true in determining whether the defendant was sexually dangerous.

monwealth v. *Zeininger*, 459 Mass. 775, 782, cert. denied, 132 S. Ct. 462 (2011); Mass. G. Evid. §§ 801-802 (2012). The judge erred in admitting this evidence.[13]

4. *Instructions of law.* The defendant contends that the judge made three errors in his final jury instructions, none of which triggered objections at trial. First, the defendant claims that the judge erred in stating, "In this case, all the experts agreed that the mental abnormality at issue is pedophilia, although the experts disagree about whether [the defendant] meets the clinical diagnostic criteria for pedophilia." The defendant contends that this instruction gave the jury the false impression that all the experts agreed that pedophilia is a mental abnormality. We agree that this instruction was error.

"Mental abnormality" is defined in G. L. c. 123A, § 1, as "a congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." An expert witness called by the defense, Dr. Joseph J. Plaud, testified that a diagnosis of pedophilia "does not carry with it any . . . statement concerning volitional control," that is, whether the pedophile's sexual attraction to prepubescent children means that the pedophile will act on that orientation by having sexual relations with young children. Another expert witness called by the defense, Dr. Daniel Kriegnan, testified more directly about the distinction between the "mental disorder" of pedophilia and a mental abnormality under the law, with only the latter requiring impairment of self-control and the likelihood of future harm to a victim. Both opined that the defendant may meet the diagnostic criteria for pedophilia but did not meet the legal criteria for a mental abnormality. The judge's instruction suggested that all the experts had agreed that pedophilia itself is a mental abnormality, which mischaracterized these expert opinions.

Second, the defendant argues that the judge erred in instruct-

---

[13]Because we conclude that the evidence was not contained in an incident report admissible under G. L. c. 123A, § 14 (c), and was not admissible under any common-law rule of evidence, we need not consider whether so unsubstantiated a rumor would be admissible if it were contained within an incident report.

ing the jury, "You may conclude that [the defendant] is likely to commit a future act of sexual misconduct if you find that [the defendant] has not committed any act of sexual misconduct during his incarceration." In the charge conference, the judge read this instruction but included the word "even" before the word "if." It appears he neglected to include the word "even" when he read this instruction to the jury. Had the word "even" been included, the instruction would have informed the jury that they need not find that the defendant committed any act of sexual misconduct while incarcerated to find the defendant sexually dangerous, which is an accurate statement of law. Without the word "even," the instruction suggests confusingly that the absence of any sexual misconduct in prison somehow supports a finding of future sexual dangerousness, which is not an accurate statement of law. This error may be harmless in some circumstances, but it was not harmless here. The prosecutor in her closing argument declared that the defendant was "sexually frustrated" after spending approximately eighteen years in prison without "access to the children that he desires," suggesting that the defendant's sexual abstinence in prison made him more likely to offend on his release.[14] The erroneous jury instruction may have given inappropriate legal validation to the prosecutor's argument.

Finally, the defendant contends that the judge erred in instructing the jury that if the evidence supports two plausible inferences, "one consistent with the finding of [the defendant] as sexually dangerous and the other that he is not," then sexual dangerousness has not been proven beyond a reasonable doubt. In *Commonwealth* v. *Beverly*, 389 Mass. 866, 873 (1983), we declared that "a reference to the consequences of an even balance in the evidence preferably should not be included in a charge on reasonable doubt," but we concluded that in the context of the entire charge this reference could not have led the jury to believe that their verdict could rest on anything less than proof beyond reasonable doubt. The same is true here. It

---

[14]This aspect of the prosecutor's argument was improper. There was neither evidence that the defendant was "sexually frustrated" nor any expert opinion that a pedophile who has served eighteen years in prison without access to children is more likely to commit sexual offenses against children on his release because he had been "sexually frustrated."

would have been preferable to omit this instruction, but it did not create confusion regarding the Commonwealth's burden of proving sexual dangerousness beyond a reasonable doubt.

We need not decide whether the judge's errors of instruction created a substantial risk of a miscarriage of justice, because we conclude that these errors, when considered together with the erroneous admission of evidence regarding the defendant's refusal of sex offender treatment, the erroneous admission of rumors that the defendant had sexually assaulted another inmate, and the prosecutor's improper closing argument regarding the defendant's sexual frustration from his time in prison, require reversal of the judgment of sexual dangerousness, the setting aside of the jury verdict, and a new trial. See *Commonwealth* v. *Cancel*, 394 Mass. 567, 576 (1985).[15]

*Conclusion.* The judgment of sexual dangerousness is reversed, the jury verdict is set aside, and the case is remanded for a new trial.

*So ordered.*

---

[15]Because of this conclusion, we need not address the defendant's other claims of improper closing argument by the prosecutor.