NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

12-P-1999                                        Appeals Court

COMMONWEALTH  vs.  KEVIN F. CAHOON.

No. 12-P-1999.

Barnstable.     February 3, 2014. - September 10, 2014.

Present:  Cohen, Hines, & Maldonado, JJ.[1]

Sex Offender.  Constitutional Law, Sex offender, Self-
    incrimination.  Evidence, Sex offender.

Civil action commenced in the Superior Court Department on
June 17, 2011.

The case was tried before Robert C. Rufo, J.

Joseph M. Kenneally for the defendant.
Julia K. Holler, Assistant District Attorney, for the
Commonwealth.

COHEN, J.  After a jury trial in Superior Court, the

defendant was found to be a sexually dangerous person (SDP),

pursuant to G. L. c. 123A, § 12.  The defendant's appeal

---

[1] Justice Hines participated in the deliberation on this
case while an Associate Justice of this court, prior to her
appointment as an Associate Justice of the Supreme Judicial
Court.

presents two issues:  (1) whether his motion for a directed verdict should have been allowed on the ground that the Commonwealth failed to establish that he is likely to reoffend sexually; and (2) whether the admission (without objection) of evidence that he terminated his participation in sex offender treatment entitles him to a new trial.  We affirm.

Background.  On January 22, 1992, the defendant was convicted of one count of rape of a child and one count of indecent assault and battery on a child under fourteen years of age, arising from the molestation of his girlfriend's three and one-half year old daughter.[2]  Eight years into his sentence, on March 9, 2000, the defendant signed a waiver of confidentiality and began participating in sex offender treatment.  He completed

---

[2] On December 27, 1994, this court affirmed the defendant's convictions in an unpublished memorandum and order pursuant to rule 1:28.  Commonwealth v. Cahoon, 37 Mass. App. Ct. 1126 (1994).  In our decision we briefly summarized the case as follows:  "The victim testified that the defendant 'did bad stuff' to her, and she described the various acts which the defendant performed, including placing his penis in the victim's mouth and her 'private,' as well as in her 'butt.'  Several witnesses testified to fresh complaints made by the victim. Medical evidence at trial included a description of a healed rectal scar which was termed 'very, very unusual,' corroborating the victim's testimony.  The defendant's theory [was] that the victim had been abused by other persons living from time to time in the household."

phases one and two; however, on June 1, 2001, he refused further treatment and therefore did not complete phases three and four.[3]

On the issue of sexual dangerousness, the Commonwealth presented two expert witnesses, Dr. Carol Feldman, who testified as a forensic psychologist retained by the Commonwealth, and Dr. Michael Henry, who was assigned as a qualified examiner in the case.  Dr. Feldman testified that the defendant "dropped out" and "refused" further treatment; Dr. Henry also testified that that the defendant "quit" and "dropped out."  Both experts linked the failure of the defendant to complete treatment to his risk of reoffense.

The defendant presented four experts:  Dr. Leonard Bard, Dr. Joseph Plaud, Dr. Katrin Rouse-Weir, and Dr. Michael Murphy, who was the other qualified examiner in the case.  These experts also commented upon the limited extent of the defendant's treatment, and one of them, Dr. Rouse-Weir, testified that "dropping out" of treatment is a factor that increased the

---

[3] As described at trial, the treatment program in question has four phases.  Phases one through three are "pretreatment" phases where the individual is introduced to basic concepts and terminology, is required to complete a workbook, attends and participates in group meetings, presents his version of the governing offense, and participates in an intake assessment. Phase four is "core treatment," where the individual receives further assessment, completes a relapse prevention plan, prepares a written release plan, and undergoes thorough evaluation of his progress on a variety of issues such as accountability, drug and substance abuse, anger and stress management, and victim empathy.

defendant's risk of recidivism, albeit not to the extent that it affected her opinion that he was not sexually dangerous.

Discussion. 1. Motion for directed verdict. In assessing the sufficiency of the evidence in an SDP case, we review the evidence in the light most favorable to the Commonwealth. See Commonwealth v. Blake, 454 Mass. 267, 271 (2009) (Ireland, J. concurring), citing Commonwealth v. Boyer, 61 Mass. App. Ct. 582, 589 (2004). See also Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). To establish that the defendant is an SDP, the Commonwealth was required to prove that (1) the defendant was convicted of a sexual offense; (2) the defendant suffers from a mental abnormality or personality disorder; and (3) the defendant's mental abnormality or personality disorder makes him likely to engage in sexual offenses if not confined to a secure facility. See G. L. c. 123A, § 1.

The defendant's argument relates to the third element, specifically, whether he is likely to engage in sexual offenses.[4]

_____

[4] There was ample evidence (and it was not disputed) that the defendant was convicted of the sexual offenses of rape and indecent assault and battery on a child. The second element was met through the testimony of the Commonwealth's experts that the defendant fit the criteria for having antisocial personality disorder -- an opinion also shared by three of the defendant's experts. Dr. Feldman also opined that the defendant suffers from nonexclusive pedophilia. Dr. Henry did not rule out pedophilia but would not adopt that diagnosis in the absence of additional data and further examination of the defendant, who had not been forthcoming when interviewed.

While acknowledging that he may have an increased risk of future criminal behavior as shown by his lengthy record of nonsexual offenses both before and after he sexually abused the victim,[5] the defendant contends that the evidence was insufficient to show that he is at risk of reoffending in a sexual manner. There is no merit to this argument, however, because the testimony of Drs. Feldman and Henry was sufficient to permit the jury to find beyond a reasonable doubt that the defendant was likely to engage in additional sexual offenses.

Briefly summarized, Dr. Feldman opined that the defendant was likely to reoffend sexually based upon a number of considerations, including the following: the defendant manifested deviant arousal, he did not complete sex offender therapy, he would not be on probation if released, he was of a relatively young age (forty-eight at the time of trial), and he scored a four on a Static 99 assessment, which put him in the moderate to high risk category of likelihood to reoffend sexually. Dr. Henry also found that the defendant fell into the

---

[5] The defendant's criminal offending began when he was ten years old. Subsequently, he was convicted of more than twenty crimes involving a wide range of offenses. As the defendant's brief acknowledges, "it is unlikely that a year went by without [the defendant] being called into court to answer to criminal charges." In addition to the governing offenses, the defendant was charged as a juvenile with one other sexual offense, an indecent assault and battery on a child under fourteen, which the defendant described as arising from an incident in which he snapped a classmate's brassiere. The complaint in that case was dismissed eight months after arraignment.

moderate to high risk category when applying the Static 99 and, when comparing the Static 99 score to dynamic risk factors such as his age, his not having completed sex offender treatment, his lengthy criminal history, and the persistence of his antisocial character orientation, formed the opinion that the defendant was at a high risk for reoffending sexually.

On the basis of this expert evidence, the Commonwealth established that the defendant was likely to engage in sexual offenses. The defendant's motion for a directed verdict therefore was properly denied.

2. Termination of treatment. Although the defendant did not object at trial, he now contends that the jury should not have heard evidence that he "dropped out" of treatment. Because the claim was not preserved below, we employ the substantial risk of a miscarriage of justice standard. Commonwealth v. Lynch, 70 Mass. App. Ct. 22, 28 (2007).

The defendant bases his argument upon Commonwealth v. Hunt, 462 Mass. 807, 819 (2012), in which the Supreme Judicial Court held that a defendant adjudicated sexually dangerous was entitled to a new trial because of multiple errors, including the introduction, over the defendant's objection, of evidence that he had refused sex offender treatment conditioned upon a waiver of confidentiality. As a threshold matter, it is questionable whether Hunt, which was decided six months after

the defendant's trial, should be applied retroactively to the defendant's unpreserved claim, given that Hunt was decided on common-law evidentiary grounds and not constitutional grounds. See id. at 815-816. See generally Commonwealth v. Dagley, 442 Mass. 713, 721 n.10 (2004). We need not confront the issue, however, because we are unpersuaded that the rationale of Hunt applies in the circumstances presented here.

As explained in Hunt, evidence that a defendant in an SDP proceeding did not receive treatment is relevant, admissible, and not unfairly prejudicial when introduced in conjunction with expert opinion, supported by empirical evidence, that those who undergo or complete sex offender treatment are less likely to reoffend sexually than those who do not. Hunt, supra at 818. Accordingly, to the extent that the jury in the present case learned that the defendant did not receive a complete course of treatment and therefore had an increased risk of recidivism, their receipt of such evidence was entirely proper.

Hunt also explained, however, that evidence that a defendant in an SDP proceeding refused treatment conditioned on a waiver of confidentiality is inherently more prejudicial than probative and, hence, inadmissible, because the jury may draw the unfair inference that the defendant did not wish to be treated. Id. at 819. The inference is unfair because waiving confidentiality raises legitimate concerns that statements made

during the course of treatment may be used adversely, i.e., to prosecute the defendant for past sexual crimes, to deny him parole, or to commit him as an SDP.  Accordingly, "[w]here sex offender treatment is conditioned on a waiver of confidentiality, refusal of treatment alone is insufficient to support an inference that the prisoner does not want to be treated."  Ibid.

The present case is distinguishable from Hunt for the obvious reason that, here, the defendant waived confidentiality and participated in the early phases of treatment.  But even if we were to assume that the concerns animating Hunt might, under different circumstances, apply by analogy to the introduction of evidence of a defendant's refusal to continue treatment after an initial waiver of confidentiality, those concerns are not implicated here.

The evidence at trial was that the defendant had given two different explanations for refusing further treatment.  When he ended his participation, he told his treatment group that he was leaving because he had gotten his sentence reduced; in fact, his motion to revise or revoke had just been denied.  Later, when being evaluated by the qualified examiners for purposes of the SDP proceedings, the defendant stated that he dropped out because he was being asked to acknowledge the full extent of the

sexual abuse reported by the victim, including certain accusations that he disputed.[6]

The first explanation has no logical connection to the avoidance of adverse consequences of disclosure. Furthermore, the timing of the defendant's refusal coupled with his untrue statement to his treatment group gives rise to a reasonable (and not unfair) inference that when he failed to obtain a reduction in his sentence, he no longer saw value in continuing treatment and did not wish to receive it. The second explanation also lacks any connection to the avoidance of the adverse use of information disclosed during treatment. The accusations disputed by the defendant were fully aired in the defendant's criminal case; as such, they already were known and available to be used against him in future proceedings, whether he acknowledged them as true.

In sum, the rationale of Hunt does not apply to the receipt of evidence that the defendant dropped out of treatment. There

---

[6] The defendant admitted to a single incident where, with the assistance of the victim's mother, he placed his penis in the victim's mouth, and then rubbed it against her vagina and ejaculated into her hand. He disputed the victim's reports of multiple episodes of abuse and denied that he had ever penetrated her vagina or anus.

was no error and, hence, no substantial risk of a miscarriage of justice.[7]

Judgment affirmed.

---

[7] To the extent that the defendant implicitly suggests that it was error to admit evidence that he denied some of the victim's accusations, the argument fails if only because the denial evidence could not have resulted in prejudice. Drs. Feldman, Murphy, Plaud, and Bard each testified to the effect that denial alone was <u>not</u> a significant factor as to recidivism and the defendant's sexual dangerousness. Dr. Rouse-Weir did not offer an opinion either way. Dr. Henry declined to agree that the defendant's denial was not associated with an increased risk of recidivism, but only because he was unaware of any research regarding partial, as distinct from complete denials. On this state of the evidence, we may be confident that the jury would not have concluded that the defendant's partial denial of his crimes elevated his risk of recidivism. For this reason, if no other, the denial evidence created no substantial risk of a miscarriage of justice.