SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. AARON ALMEIDA, JR.

 
 Docket:
 SJC-13075
 
 
 Dates:
 May 9, 2025 – October 27, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Homicide. Assault and Battery by Means of a Dangerous Weapon. Armed Assault with Intent to Murder. Practice, Criminal, Warrant, Affidavit, Motion to suppress, Empanelment of jury, Challenge to jurors, Jury and jurors, Mistrial, Voir dire, Capital case. Constitutional Law, Jury. Search and Seizure, Warrant, Affidavit, Probable cause. Jury and Jurors. Probable Cause. Evidence, Videotape, Identification, Relevancy and materiality. Identification.
 
 

             Indictments found and returned in the Superior Court Department on November 8, 2016.
            Pretrial motions to suppress evidence and for a hearing on the affidavit supporting a search warrant were heard by Mary K. Ames, J., and the cases were tried before her.
            Robert F. Shaw, Jr., for the defendant.
            Ian MacLean, Assistant District Attorney, for the Commonwealth.
            BUDD, C.J.  A jury convicted the defendant, Aaron Almeida, Jr., of murder in the first degree on theories of extreme atrocity or cruelty and deliberate premeditation for the killing of Ailton Goncalves.  The jury also convicted the defendant of aggravated assault and battery by means of a dangerous weapon of Merly Miranda and armed assault with intent to murder Miranda.[1]  The defendant appeals from his convictions and argues that he is entitled to a new trial.  After full consideration of the trial record and the defendant's arguments, we affirm the defendant's convictions and decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.
            Background.  We summarize the facts as the jury could have found them, reserving certain details for later discussion.  Shortly after midnight on August 20, 2016, a small group of people were gathered at the front entrance to a dwelling on Dudley Terrace in the Dorchester section of Boston.  The defendant, who was wearing a dark sweatshirt with the hood over his head, light faded jeans, and black shoes, approached the group on foot and fired eight shots, killing Goncalves and severely injuring Miranda.  The defendant then fled on foot.
            Surveillance footage obtained the night of the shooting captured events surrounding the shooting.  Less than one-half hour before the shooting, surveillance footage shows an individual identified as Danilo DePina drive a white car down Dudley Street toward Dudley Terrace, and make a three-point turn at the base of Dudley Terrace, before turning back onto Dudley Street and traveling in the direction from which it came -- an apparent attempt to conduct reconnaissance on the victims.[2]  The white car then parked on a nearby street where surveillance footage shows the defendant grabbed a dark-colored sweatshirt from a different parked car and then entered the white car driven by DePina, which soon drove away.  At 12:02 A.M., surveillance footage captured the defendant walking down Dudley Street while speaking on a cell phone.  Analysis of the defendant's cell phone records revealed that this telephone call was made from DePina's cell phone, and cell site location information (CSLI) indicated that the defendant's cell phone connected to a cell tower in the vicinity of the murder at the time the telephone call was made.  Once this telephone call ended, the defendant turned around and walked toward Dudley Terrace -- the scene of the shooting.
            Just before the shooting, which was called in to police at 12:05:59 A.M., surveillance footage captured the defendant turning right onto Dudley Terrace, a dead-end street.  Seconds later, the defendant is seen running back the way he came and turning left onto Dudley Street with his right hand tucked into the pocket of his sweatshirt and his left arm pumping as he ran.
            Seven days after the murder, Boston police officers arrested the defendant after observing him leaving a residence in the Dorchester section of Boston (Dorchester apartment).  The police obtained a search warrant for this residence and recovered several clothing items that matched what the defendant was wearing on the night of the shooting.
            Discussion.  On appeal, the defendant claims that his motion to suppress improperly was denied, and that the judge made various errors during the trial that together warrant reversal.
            1.  Search warrant.  Prior to trial, the defendant sought to suppress evidence obtained as a result of a search of the Dorchester apartment.  He argued first that the evidence was the fruit of his statement to police that was later suppressed.  He also sought a Franks[3] hearing, arguing that the search warrant affidavit omitted material information that would have negated the finding of probable cause for the search.  See Commonwealth v. Andre, 484 Mass. 403, 407-408 (2020).  On appeal, the defendant argues that the judge erred in denying both motions.  We disagree.
            a.  Fruit of suppressed statement.  During a postarrest interview that was later suppressed, the defendant told police that he lived with his uncle at the Dorchester apartment where the police had observed him shortly before his arrest.  A detective later submitted a search warrant affidavit, which included this information from the defendant, and ultimately was granted a warrant to search the apartment.[4]  A subsequent search revealed distinctive clothing and sneakers, which the Commonwealth argued matched those belonging to the shooter.  Although the exclusionary rule bars the use of unconstitutionally obtained evidence, "information 'received through an illegal source is considered to be cleanly obtained when it arrives through an independent source.'"  Commonwealth v. Pearson, 486 Mass. 809, 812-813 (2021), quoting Murray v. United States, 487 U.S. 533, 538-539 (1988).
            Here, the Commonwealth claims that the independent source exception applies, arguing it has met its burden to show, by a preponderance of the evidence, that (1) the officers' decision to seek the search warrant was not prompted by what they learned during the illegally acquired statement; and (2) the affidavit supporting the search warrant application contained sufficient information to establish probable cause, apart from any information obtained during the illegally obtained statement.  See Pearson, 486 Mass. at 813.
            Beginning with the question whether the police's decision to obtain a search warrant was "prompted by" what they learned in the suppressed interview, we conclude that it was not (citation omitted).  Pearson, 486 Mass. at 813-814.  Although the affidavit stated that officers proceeded to freeze the Dorchester apartment "[a]fter learning" the defendant admitted to staying there, we "must infer motivation [to seek a warrant] from the totality of facts and circumstances."  Id. at 815, quoting United States v. Restrepo, 966 F.2d 964, 972 (5th Cir. 1992).
            The question under the first prong is whether the Commonwealth proved by a preponderance of the evidence that the police would have sought a search warrant for the Dorchester apartment even without the defendant's suppressed statement.  See Pearson, 486 Mass. at 813, 815-816.  The information gleaned from police surveillance and statements by the defendant's family members established that the defendant was transient –- occasionally staying at the Dorchester apartment and occasionally staying with his father at a residence in the Hyde Park section of Boston (Hyde Park home).  See infra.  Notwithstanding the fact that the defendant's father stated that the defendant had not been at the Hyde Park home in two weeks, the police decided to seek a search warrant for that residence.  This demonstrated that the police were committed to searching the residences they understood to be connected to the defendant, even in the face of countervailing statements -- a reasonable inference given the fact that police were investigating a homicide.  Moreover, the defendant's uncle told police that the defendant was showering at the Dorchester apartment the morning of his arrest, which would make it likely that the defendant kept clothing at the Dorchester apartment, providing further reason to search the apartment.
            Turning to the second prong, separate and apart from the defendant's unlawfully obtained statement, the affidavit contained "sufficient information for an issuing magistrate to determine that the items sought [were] related to the criminal activity under investigation, and that the items reasonably [might] be expected to be located in the place to be searched when the search warrant was issued" (quotation and citation omitted).  Pearson, 486 Mass. at 816.  Pertinent here, "[t]he nexus to search a residence for evidence of a crime may be found in the type of crime, the nature of the . . . items [sought], the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide [items of the sort sought]" (quotation omitted).  Commonwealth v. Alexis, 481 Mass. 91, 102 (2018).  See, e.g., Commonwealth v. James, 424 Mass. 770, 778 (1997) (reasonably likely that "durable[ items] of continuing utility to the defendants" like knives, sneakers, dark clothing, and face masks would be kept at home).  We determine de novo whether a search warrant was supported by probable cause based on the facts contained within the four corners of the affidavit and reasonable inferences drawn therefrom.  Commonwealth v. Perkins, 478 Mass. 97, 102 (2017).
            Here, the affidavit states that Boston police began searching for the defendant at approximately 7 A.M. on August 27, 2016, and, at 10:40 A.M., they observed him leave the Dorchester apartment and get into a vehicle driven by his grandmother.  Once the officers stopped the car and arrested the defendant, the defendant's grandmother stated that the defendant lived with his father at the Hyde Park home.  After "freez[ing]" the Hyde Park home pending the issuance of a search warrant, police interviewed the defendant's father, who informed them that the defendant lived with him at the Hyde Park home but had not stayed at the home in two weeks.  Moreover, detectives interviewed the defendant's uncle, a resident of the Dorchester apartment, who stated that the defendant occasionally slept there but denied both that the defendant lived there and that the defendant slept there during the weekend of the murder.  The uncle additionally stated that the defendant arrived at the Dorchester apartment on the morning he was arrested at 7 A.M. to take a shower and meet his grandmother, who was planning to pick him up.
            These facts and the reasonable inferences drawn therefrom established a "substantial basis for concluding that evidence connected to the crime [would] be found" at the Dorchester apartment (citation omitted).  Perkins, 478 Mass. at 104.  Although both the defendant's grandmother and father stated that the defendant lived at the Hyde Park home, the father revealed that the defendant had not been there in two weeks.  This information, considered in conjunction with the uncle's statement that the defendant sometimes stayed at the Dorchester apartment and bolstered by the fact that the defendant was seen leaving that apartment on the morning of his arrest, supported the reasonable inference that the defendant had been staying at the Dorchester apartment in the days after the shooting.  Cf. Commonwealth v. Andre-Fields, 98 Mass. App. Ct. 475, 483 (2020) (although affidavit did not "affirmatively establish" target apartment was defendant's "primary residence," probable cause existed where it could be inferred defendant stayed at two places).  It would be reasonable to expect that evidence of the crime would be found at the Dorchester apartment, even seven days after the crime occurred.  Not only did circumstantial evidence suggest that the defendant was staying at the Dorchester apartment for at least two weeks, but also the police observed the defendant leaving that apartment (after reportedly showering) the day of his arrest, strengthening the inference that he kept clothes at the apartment.  See Commonwealth v. Guastucci, 486 Mass. 22, 28 (2020) ("item that is durable, of enduring use to its holder, and not inherently incriminating might reasonably be found in the same location several weeks later"); James, 424 Mass. at 778-779 (staleness determined on case-by-case basis; eighteen days "not unreasonable" in violent homicide investigation).
            b.  Franks hearing.  The defendant also filed a motion seeking a Franks hearing, alleging that the affidavit supporting the warrant for the Dorchester apartment omitted material information from the detectives' interview with the defendant's uncle that "undermined the probable cause determination."  Specifically, the defendant argues that the affidavit improperly omitted the uncle's statements that (1) the defendant had not lived at the Dorchester apartment for at least eighteen months, (2) the defendant did not have a key to the residence and had no way to access the apartment by himself, (3) in the three to four months before the shooting, the defendant had only slept over at the Dorchester apartment seven or eight times, and (4) the uncle had not seen the defendant in ten to eleven days (the murder being one week before the interview).
            The judge denied the defendant's motion, reasoning that the defendant failed to make the substantial preliminary showing that a reckless or intentional omission had been made.  On appeal, the defendant argues that the judge abused her discretion in refusing to grant a Franks hearing.  We are not persuaded.
            To be entitled to a Franks hearing, a defendant must make a substantial preliminary showing that an affiant either included a false statement or omitted material knowingly and intentionally, or with reckless disregard for the truth and, in the case of an omission, "that the inclusion of the omitted information would have negated the magistrate's probable cause finding."  Andre, 484 Mass. at 407-408.  As this analysis requires the court to evaluate the subjective intent of the affiant, our review focuses on the affiant's statements at the time they were made.  Cf. Lee v. Harris, 127 F.4th 666, 674 (7th Cir. 2025) ("We consider only what the officer knew at the time he sought the warrant, not at how things turned out in hindsight" [quotation and citation omitted]).
            Here the judge did not abuse her discretion in denying the defendant's motion for a Franks hearing because at the time that the affiant submitted the affidavit, it included the defendant's statement that he resided at the Dorchester apartment, which was not suppressed until years into the ligation.  See note 4, supra.  In light of the defendant's unequivocal admission that he lived at the Dorchester apartment, the judge correctly concluded that the defendant failed to make a preliminary showing that the affiant made a reckless or intentional omission.
            2.  Jury empanelment.  a.  Juror no. 101.  During jury empanelment, the judge asked prospective juror no. 101, as she did all other prospective jurors, whether he would "be able to assess the credibility of a police witness in exactly the same wa[y] as any other witness."  Juror no. 101 replied that he would "like to think [he] could."  The judge then asked, "Is there a question about that?"  Juror no. 101 stated, "[W]ell, my only question is that -- and I didn't say it earlier.  But my only question is that, you know, sometimes police don't tell the truth."  Nevertheless, juror no. 101 maintained that he would not have a bias against police witnesses and would base his credibility determinations on the testimony at trial.
            After this initial round of questioning, the prosecutor asked the judge to follow up with juror no. 101 regarding his view on the credibility of police witnesses.  When the judge then asked juror no. 101 to elaborate, he stated:
"So my thoughts are things that I've seen, you know, I've seen on TV.  I can't say that I've technically witnessed, but a lot of stuff I've seen like on the news and stuff and then the final outcomes.  It just proved that they didn't tell the truth or they did something to the evidence or whatever.  And my hope is that, you know, just because you're a police officer doesn't mean that you can lie.  You just have to tell the truth.  That's the whole thing."
            Upon further questioning from the judge, juror no. 101 clarified that he would judge a police officer's testimony "based on the evidence," stating, "It's not what I've seen in the past.  It's just based on what I hear."  The judge then found the prospective juror indifferent and subsequently denied the Commonwealth's attempt to strike the juror for cause.[5]
            The prosecutor then attempted to exercise a peremptory strike against juror no. 101, and the defendant raised a Soares[6] challenge.  The judge noted that juror no. 101 appeared to be a Black male and asked the prosecutor to articulate the reason for the peremptory strike.  The prosecutor responded:
"[I]t's why I asked for cause.  I am concerned about the fact, again, that he said based on things he sees on TV, I believe he said he drew a conclusion that the police did something to the evidence. . . .  I am concerned that if a potential juror can draw a conclusion about police misconduct based on something he sees simply on television, I'm concerned about that and what he brings into the jury box with him but also what he would do here."
            The judge found the prosecutor's reason adequate, and the defendant objected, stating in part: 
"That shouldn't be a reason, a race-neutral reason to strike, because it's all about the race.  He has these opinions because he happens to be [B]lack.  He happens to live in Roxbury."
The judge rejected the defendant's argument, finding that the Commonwealth's proffered reason was adequate and genuine, "given the totality of the circumstance[s]," and explicitly noting her finding that the prospective juror did not express that he has an opinion on police credibility "based upon his race, ethnicity or residence."[7]
            On appeal, the defendant claims that the judge abused her discretion by allowing the Commonwealth to exercise a peremptory strike on juror no. 101.  We disagree.  "The Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights prohibit a party from exercising peremptory challenges on the basis of a juror's membership in certain discrete groups."  Commonwealth v. Mason, 485 Mass. 520, 529 (2020).  "Both constitutions 'forbid[] striking even a single prospective juror for a discriminatory purpose.'"  Commonwealth v. Sanchez, 485 Mass. 491, 493 (2020), quoting Flowers v. Mississippi, 588 U.S. 284, 303 (2019).
            Challenges to peremptory strikes are subject to the familiar three-step Batson-Soares burden-shifting analysis.  See Commonwealth v. Jackson, 486 Mass. 763, 768 (2021), citing Batson v. Kentucky, 476 U.S. 79, 94-95 (1986); Commonwealth v. Soares, 377 Mass. 461, 489-491, cert. denied, 444 U.S. 881 (1979).
"First, to rebut the presumption that the strike was proper, the challenger must make out a prima facie case that it was impermissibly based on race or other protected status by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Second, [i]f a party makes such a showing, the burden shifts to the party exercising the challenge to provide a 'group-neutral' explanation for it.  Third and finally, the judge must then determine whether the explanation is both 'adequate' and 'genuine.'"  (Quotations, citations, and footnote omitted.)
Jackson, supra.  As we explained in Commonwealth v. Maldonado, 439 Mass. 460, 464-465 (2003), an adequate explanation is one that is clear and reasonably specific, personal to the juror, not based on the juror's group affiliation, and related to the case being tried.  A genuine explanation is one that is "in fact" the reason for the strike:  "[a]n explanation that is perfectly reasonable in the abstract must be rejected if the judge does not believe that it reflects the challenging party's actual thinking."  Id. at 465.
            At each step of the Batson-Soares analysis, "we review a judge's decision allowing the peremptory strike of a potential juror for abuse of discretion."[8]  Jackson, 486 Mass. at 768.  That is, we must determine whether "a decision resulted from 'a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives.'"  Id., quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).
            First, we reject the defendant's claim that the judge abused her discretion by finding that the prosecutor's group-neutral explanation was adequate.  As detailed supra, the prosecutor stated that he based the peremptory strike on the prospective juror's hesitation when asked whether he would assess the testimony of a police officer the same as any other witness, in addition to juror no. 101's further explanation that seemed to indicate that he had seen things on television that led him to these beliefs.  See note 5, supra.  The judge did not err in finding that the prosecutor's reason was clear and reasonably specific, personal to the juror, and not based on the juror's group affiliation.[9]  See Maldonado, 439 Mass. at 464.
            Second, we disagree with the defendant's assertion that the prosecutor's misstatement of the record evinced discriminatory intent and therefore was not a genuine basis upon which to exercise a peremptory strike.  See Flowers, 588 U.S. at 314 ("When a prosecutor misstates the record in explaining a strike, that misstatement can be another clue showing discriminatory intent").  Acknowledging that the prosecutor did not perfectly recite juror no. 101's statement,[10] we discern no discriminatory intent where the prosecutor disclaimed that he was "paraphrasing" the prospective juror's words, all of which he "didn't get."  See note 5, supra.  Indeed, because "the back and forth of a Batson hearing can be hurried, and prosecutors can make mistakes when providing explanations[, which] is entirely understandable, . . . mistaken explanations should not be confused with racial discrimination."[11]  Flowers, supra.
            Finally, we decline the defendant's invitation to create a new rule that critical views of law enforcement or the legal system cannot be accepted as race-neutral explanations for a peremptory strike.  Citing social science articles as "overwhelming evidence demonstrat[ing that Blacks] hold attitudes more critical and scrutinizing of our criminal legal system," the defendant argues that allowing parties to justify peremptory strikes based on these ostensibly race-neutral reasons has the effect of "facilitat[ing] implicit racial bias" and removing prospective jurors of color from the jury.
            Although we do not adopt the defendant's preferred per se rule, we share the defendant's concern that these kinds of questions relative to distrust of law enforcement or of the criminal legal system may be used impermissibly as a proxy for race, whether intentionally or not.  See Commonwealth v. Prunty, 462 Mass. 295, 313 (2012), quoting Hernandez v. New York, 500 U.S. 352, 379 (1991) (Stevens, J., dissenting) ("An explanation that is 'race neutral' on its face is nonetheless unacceptable if it is merely a proxy for a discriminatory practice").  See also Commonwealth v. Williams, 481 Mass. 443, 461 n.1 (2019) (Gants, C.J., concurring) ("nationwide, eighty-two percent of [B]lack voters and forty-two percent of white voters believe criminal justice system treats [B]lack people unfairly").
            Accordingly, we stress that trial judges must thoughtfully scrutinize the adequacy of facially group-neutral explanations that seem to correlate with race (or other protected groups) to ensure that peremptory strikes are "not based on the juror's group affiliation" (citation omitted).  Maldonado, 439 Mass. at 464.  Cf. Jackson, 486 Mass. at 777, 780 n.27 (noting "need for careful consideration" of strikes based on minor offenses committed by prospective Black juror's two sons).[12]  Such thoughtful scrutiny took place here.  When juror no. 101 was asked to explain his views on police credibility, he offered that his view that sometimes police do not tell the truth was based on things he had seen on television -- an answer that did not have an apparent connection to the prospective juror's racial identity or lived experiences proximate to his identity.  See supra.  The prosecutor then, when asked by the judge to give the reason for the strike, voiced a concern based on the impact of what the prospective juror had seen on television.  In these circumstances, there was no error in allowing the Commonwealth to exercise a strike against juror no. 101.  Contrast Prunty, 462 Mass. at 313 ("It would require a measure of 'willful intellectual blindness,' for us to conclude that Juror no. 16's experience of racism [particularly the race-specific examples described by the judge in his questioning] does not correlate almost perfectly with his race and therefore serve as a 'surrogate for race'" [citations omitted]).
            b.  Juror no. 92.  During the individual voir dire of juror no. 92, the prospective juror and the judge had the following exchange:
Q.:  "Would you be able to assess the credibility of a police witness in exactly the same way as any other witness?"
A.:  "Yes."
Q.:  "Do you have a question about that?"
A.:  "I have some misgivings about police officers and their ability to assess the situation when they are under stress.  And so I --"
Q.:  "So you have some concerns --"
A.:  "Yeah."
Q.:  "-- about the manner in which you would assess credibility.  And, for that reason, thank you so very much, you are excused."
The defendant objected, arguing that juror no. 92 indicated that she only had some concerns about the ability of police officers to assess a situation under stress, and that "the next question should have been, . . . would it affect your ability to be fair and impartial."  The judge overruled the defendant's objection.
            On appeal, the defendant argues that the judge's disqualification of juror no. 92 violated our holding in Williams, 481 Mass. 443, resulting in reversible error.  Although we agree that the judge erred in prematurely striking the prospective juror for cause, we conclude that the defendant suffered no prejudice as a result.
            "We give great deference to a judge's decision to excuse a prospective juror for cause during empanelment, because a judge who has spoken directly with the juror is better positioned than we are to evaluate the juror's credibility and impartiality."  Commonwealth v. Hunt, 462 Mass. 807, 821 (2012).  Accordingly, we review a judge's decision to dismiss a prospective juror for an abuse of discretion.  Id.  Notwithstanding this discretion, "the judge's conclusion must be supported by a voir dire that sufficiently uncovers whether the prospective juror can fairly evaluate the evidence and follow the law."  Williams, 481 Mass. at 447.  We emphasized in Williams that "in determining each prospective juror's ability to be impartial, although a judge may require a prospective juror to set aside an opinion regarding the case, the judge should not expect a prospective juror to set aside an opinion born of the prospective juror's life experiences or belief system."  Id. at 449.  We further explained that when "a prospective juror has expressed an opinion or world view based upon his or her life experience or belief system, rather than asking him or her to set it aside (which is difficult if not impossible to do), a judge must determine whether, given that particular opinion, the juror nevertheless is able to be impartial in the case to be tried."  Id. at 448-449.
            In this case, juror no. 92 expressed "misgivings" about police officers' ability to assess situations when they are under stress.  See supra.  The judge subsequently dismissed the prospective juror without attempting to determine whether her views would affect her ability to be fair and impartial.[13]  See Williams, 481 Mass. at 446-447 (voir dire that did "not address whether [prospective juror] could fairly evaluate the evidence and apply the law given her belief regarding the justice system" was "incomplete").  See also id. at 453, quoting Commonwealth v. Auguste, 414 Mass. 51, 53-54, 57 (1992) ("judge was required to investigate whether 'juror would be impartial in his or her determination of the evidence'").  The judge should have asked the prospective juror questions to determine whether, having these views about police, she would be able to fairly evaluate the evidence and apply the judge's legal instructions.  See Williams, supra.  Under these circumstances, only after learning the answers to these questions would the judge have been justified in dismissing the juror for cause if the judge was convinced that the juror could not be impartial.  See id.
            Although we conclude that the judge erred, the defendant was not prejudiced.  As in Williams, the Commonwealth had a peremptory challenge remaining and, here, the prosecutor indicated, although not explicitly, that he would have used one against juror no. 92.[14]  See Williams, 481 Mass. at 453-454 ("the defendant . . . suffered no actual prejudice from the error, as the Commonwealth completed jury selection with a peremptory challenge left available to use [and which could have been used on the prospective juror had she not been excused for cause]").[15]
            c.  Jurors nos. 56 and 63.  On the second day of empanelment, two venirepersons[16] told the judge that they would not be able to attend court proceedings on Yom Kippur because they would be observing the upcoming Jewish holiday.  Anticipating that the jurors' observance of the holiday would pose a conflict with the trial, the judge excused the two jurors.[17]  On appeal, the defendant claims that the judge's excusal of the two jurors violated G. L. c. 234A, § 3, in addition to his right to be tried by a fair and impartial jury drawn from a fair cross section of the community, as guaranteed by the Federal Constitution and the Massachusetts Declaration of Rights.  These claims are without merit.[18]
            We begin with the defendant's statutory claim.  General Laws c. 234A, § 3, precludes, in relevant part, exclusion or exemption from jury service on the basis of religion.  Far from excluding the two jurors based on their religion, the judge appropriately excused the two jurors after they informed the court that serving on the jury in this case would conflict with their religious exercise.  See Commonwealth v. Evans, 438 Mass. 142, 149 (2002), cert. denied, 538 U.S. 966 (2003) (jurors "excused on the basis of a hardship they asked [the judge] to consider" did not violate G. L. c. 234A, § 3).  Moreover, the judge appropriately engaged in an individual colloquy with each juror to determine whether the holiday would pose an issue with the trial schedule, and did not implement a "blanket rule."  Contrast Commonwealth v. Brown, 449 Mass. 747, 772 (2007) (systematic exclusion of student venirepersons violated G. L. c. 234A, § 3).  The judge was well within her discretion to excuse the two jurors based on their expressed hardship.  See G. L. c. 234A, § 40 ("judge may excuse a juror from performing his juror service [for a trial lasting more than three days] upon a finding of hardship, inconvenience, or public necessity").
            Similarly, the judge's decision to excuse the jurors did not violate the Federal Constitution or art. 12.  Both Constitutions protect the right to be tried before a "jury drawn fairly from a representative cross section of the community."  Soares, 377 Mass. at 478-479.  However, this right "cannot require that each jury include constituents of every group in the population."  Commonwealth v. Benjamin, 430 Mass. 673, 677 (2000), quoting Soares, supra at 481.  Moreover, "States are free to grant exemptions from jury service to individuals in case of special hardship," Taylor v. Louisiana, 419 U.S. 522, 534 (1975), without violating the fair cross section requirement.
            The defendant claims that the judge was required to suspend trial for the holiday to allow the Jewish jurors to serve.  Although it would have been within the judge's discretion to do so, such action is not constitutionally required.  Cf. Scott v. Dugger, 891 F.2d 800, 804 (11th Cir. 1989), cert. denied, 498 U.S. 881 (1990) (no constitutional violation where judge declined to postpone trial by single day to accommodate five prospective jurors' observance of Jewish holiday).  As explained supra, because the judge did not systematically exclude the jurors and excused them only after finding that requiring them to serve in this case would interfere with the jurors' own religious practices, the defendant's constitutional rights to a jury based on a fair cross section of the community were not violated.[19]
            3.  Video identification.  The Commonwealth moved in limine to allow two Boston police officers to identify the defendant as the person depicted in surveillance footage from the night of the shooting.  After a voir dire of the potential witnesses outside the presence of the jury and argument from counsel, the judge permitted the Commonwealth to introduce the testimony of one of the proffered witnesses over the defendant's objection.[20]  On appeal, the defendant argues that the judge erred in allowing the officer to make the identification.  We discern no error.
            "Making a determination of the identity of a person from a photograph or video image is an expression of an opinion."  Commonwealth v. Wardsworth, 482 Mass. 454, 475 (2019), quoting Commonwealth v. Pina, 481 Mass. 413, 429 (2019).  Because the purpose of these identifications is to "assist the jurors in making their own independent identification," they are admissible only "when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess" (citations omitted).  Wardsworth, supra.  "Even where a witness is familiar with a defendant, his or her testimony is not admissible where 'the witness is no better-suited than the jury to make the identification'" (citation omitted).  Id.
            Accordingly, judges must assess the familiarity of the witness with the defendant and the helpfulness of the identification to the jury.  See Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 325 (2000), citing Proposed Mass. R. Evid. 701 (lay opinion permissible if "[a] rationally based on the perception of the witness and [b] helpful to a clear understanding of his testimony or the determination of a fact in issue").  Moreover, where police officers are the ones to provide the identification, such testimony "is not permissible absent some compelling reason that the police officer is in a better position than the jury to identify the defendant."  Pina, 481 Mass. at 430.
            We begin by noting that the determination of familiarity and helpfulness is a highly fact-specific task entrusted to the discretion of the trial judge.  See Commonwealth v. Brum, 492 Mass. 581, 593-594 (2023) (admission of lay opinion identification testimony reviewed for abuse of discretion).  In this case, after a lengthy voir dire, the judge credited the officer's testimony concerning his familiarity with the defendant.  The officer had repeated prior interactions with the defendant as a "community" officer, ranging from casual conversations, to "near[] daily" sightings in familiar locations, to formal arrest and field interrogation observations.  The judge did not abuse her discretion in determining that the officer was sufficiently familiar with the defendant.  Compare, e.g., Brum, supra at 593 (sufficient familiarity where witness knew defendant since middle school and dated his roommate); Pleas, 49 Mass. App. Ct. at 328 (officer sufficiently familiar where he knew defendant socially for years), with Commonwealth v. Fisher, 492 Mass. 823, 850-851 & n.28 (2023) (officer's observation of defendant during arrest and through repeated review of surveillance video footage insufficient); Commonwealth v. Belnavis, 104 Mass. App. Ct. 798, 802-803 (2024) (officers' "infrequent and sporadic" encounters with defendant over several years insufficient).
            The record likewise supports the judge's finding that the officer's testimony would be helpful to the jury because the defendant's hat and hooded sweatshirt would have made it difficult for someone who was not already familiar with the defendant to identify him.[21]  The judge did not abuse her discretion when she carefully considered the video footage's quality and opportunity to view the suspect as related to whether the testimony would be of help to the jury.[22]  We also note that the identification was brief and substantial other evidence linked the defendant to the video surveillance footage, including the distinctive clothing found at the Dorchester apartment and his cell phone and CSLI data.  Cf. Commonwealth v. Vacher, 469 Mass. 425, 442 (2014) (no reversible error where improper identification testimony was brief and fleeting and "did not overwhelm the other compelling, properly admitted evidence against the defendant").  Contrast Wardsworth, 482 Mass. at 476-477 (four officers providing only evidence of identity prejudiced defendant).
            The defendant further claims that even if the officer's proffered testimony met the prerequisites for proper lay opinion, it was substantially more prejudicial than probative.  See Wardsworth, 482 Mass. at 477.  We disagree.  No doubt mindful that identification testimony from a police officer "risks bringing with it a 'greater imprint of authority'" (citation omitted), id., the judge carefully weighed this probative value against the potential for unfair prejudice.  The judge precluded the officer from revealing the fact of the defendant's prior arrest, see note 24, infra, or any alleged gang affiliation and limited the Commonwealth to only calling one officer to make the identification (when two were originally proffered).  Contrast Wardsworth, supra at 476-477 (prejudice heightened by cumulative testimony of four officers identifying defendant from surveillance footage).  Finally, before the officer's trial testimony, the judge gave a comprehensive limiting instruction.[23]
            4.  Motion for mistrial.  At trial, the officer called by the Commonwealth to identify the defendant from surveillance footage, see supra, testified that, "in the year of 2016 or so," he had seen the defendant on the street "dozens of times."[24]
            On cross-examination, after eliciting testimony from the officer that he had seen the defendant more than five times between January 2015 and August 2016, trial counsel moved for a mistrial, contending that the witness had perjured himself because the defendant was incarcerated during that time period.[25]  After the judge denied the motion for a mistrial, trial counsel continued to insist that the prosecutor had an obligation to "fix" the perjured testimony.[26]  In response, the prosecutor suggested conducting a voir dire of the officer to determine whether he had, in fact, perjured himself.  Trial counsel objected, suggesting instead that the questioning take place before the jury so that the officer would not have an opportunity to "correct" his allegedly perjurious statements.  Concerned that additional questioning in this area risked exposing the jury to information regarding the defendant's prior arrest, see note 24, supra, the judge allowed a voir dire of the officer outside of the presence of the jury.  During this voir dire, the officer revealed that although he had previously arrested the defendant in early January 2015, he was unaware that the defendant had been in custody from that time until June 2016.  The officer further clarified that the "bulk of" his interactions he had had with the defendant occurred during the summer of 2016 -- after the defendant's release from custody in June 2016.
            On appeal, the defendant claims that permitting the voir dire "interrupted" trial counsel's cross-examination of the officer, thereby violating the defendant's rights to confrontation and fundamental fairness.  See Commonwealth v. Garcia, 470 Mass. 24, 35 (2014).  We disagree.  In fact, it was trial counsel who suspended the cross-examination to move for a mistrial.  When the motion was denied, she went on to insist that the prosecutor "do something" about the alleged perjured testimony.  "A judge . . . has broad latitude to direct the course of a trial . . . [so long as] the defendant [is not] prejudiced thereby" (quotation and citation omitted).  Commonwealth v. Vardinski, 438 Mass. 444, 451 (2003).  Here, the judge's decision to conduct a voir dire to determine whether the officer committed perjury was not an abuse of discretion, nor did it prejudice the defendant.[27]
            5.  Relief pursuant to G. L. c. 278, § 33E.  Finally, the defendant requests that we reverse the judgments, set aside the verdicts, and grant him a new trial pursuant to our power under G. L. c. 278, § 33E.  After plenary review of the entire record, we discern no basis upon which to exercise our extraordinary authority under § 33E.
            Conclusion.  For the foregoing reasons, the judgments of the defendant's convictions of murder in the first degree, aggravated assault and battery by means of a dangerous weapon, and armed assault with intent to murder are affirmed.  We vacate the judgment of the defendant's conviction of unlawful possession of a firearm, set aside that verdict, and remand for further proceedings consistent with Commonwealth v. Guardado, 493 Mass. 1, 12 (2023), cert. denied, 144 S. Ct. 2683 (2024).
            So ordered.

 
footnotes

            [1] The defendant additionally was convicted of unlawful possession of a firearm.  We vacate this conviction and remand for further proceedings.  See Commonwealth v. Guardado, 493 Mass. 1, 12 (2023), cert. denied, 144 S. Ct. 2683 (2024).
            [2] DePina was originally charged with murder in the first degree but ultimately pleaded guilty to manslaughter and three related charges.
            [3] See Franks v. Delaware, 438 U.S. 154, 155-156 (1978).
            [4] The warrant affidavit stated:
"When asked about his whereabouts on the Friday night into Saturday morning at about midnight, [the defendant] told us that he left Hancock Street about 11:00 P.M. and went home to [the Dorchester apartment] and denied being on Dudley Street.  We then asked him about where he was living and he told us that he lived with his uncle . . . and his cousin . . . in the [Dorchester apartment].  After learning of this I directed police officers to go to [the Dorchester apartment] and freeze [it] until a search warrant could be obtained."
            [5] In challenging the prospective juror for cause, the prosecutor stated, in pertinent part:
"I am concerned about the statement where he says, and I'm paraphrasing -- I didn't get -- based on things he's seen on TV, the police did something to the evidence, the way he struggled with the answer to the question the first time when you asked about would you believe a police officer, whatever the question was, I saw a hesitation.  I just have some concerns."
            [6] See Commonwealth v. Soares, 377 Mass. 461, 486, cert. denied, 444 U.S. 881 (1979).
            [7] The judge also stated,
"I feel that in observing the juror that he was doing his very best to be candid with the Court, but I could see that he was struggling with the answer, as well.  I don't think it was something based upon a TV show.  That's not the impression I got.  But I did see that he was struggling with it, fairly so."
            [8] Notwithstanding the deference to trial judges that we traditionally extend in evaluating the adequacy of a proffered group-neutral reason, the Commonwealth concedes that this step is likely a mixed question of law and fact.  However, as the defendant does not ask us to reconsider whether continued deference on this step is prudent, we decline to do so here.
            [9] We similarly reject the defendant's argument that the judge failed to make specific findings.  Although the defendant objected before the judge ruled that the Commonwealth's reason was both adequate and genuine, the judge's reasons and findings are fully articulated on the record.
            [10] In explaining his basis for using a peremptory strike, the prosecutor erroneously suggested that juror no. 101 believed that the police had tampered with the evidence in this case.
            [11] We note that trial counsel erroneously agreed with the Commonwealth's summary of juror no. 101's statement, acknowledging that "[juror no. 101] did say exactly what the Commonwealth said he said," an opinion that was also articulated by the trial judge.
            [12] The defendant asks us to adopt a rule similar to one promulgated by the Washington Supreme Court, which would significantly reshape our Batson-Soares framework.  See Wash. Gen. R. 37.  We observe, however, that Washington's rule was implemented after a multiyear process involving input from various stakeholders, an informed process that is absent from this case.  See State v. Jefferson, 192 Wash. 2d 225, 243-244 (2018) (en banc).
            [13] The Commonwealth contends that there was no error because the judge excused juror no. 92 based not simply on her beliefs about police officers, but also on the judge's assessment of juror no. 92's hesitation and body language during voir dire.  Although the judge did make additional findings regarding juror no. 92's body language and found that the juror was hesitating, we are unconvinced by this reasoning, just as we were in Williams.  See Williams, 481 Mass. at 453 n.9 (prospective juror's hesitation insufficient to justify for-cause strike where questioning was not "done in a way that would allow the judge to determine the prospective juror's ability to fairly evaluate the evidence and follow the judge's instructions").
            [14] The prosecutor stated that he was glad the judge excused juror no. 92 for cause and, had the judge not sua sponte excused the juror, the prosecutor would have asked the judge to follow up with the prospective juror based on her answers during individual voir dire.
            [15] The defendant suggests that in Williams, 481 Mass. at 456, we found no reversible error only because "the judge made a good faith attempt to gauge whether [the prospective juror] was qualified to serve . . . [and] did not conclude or otherwise suggest that the prospective juror's belief about the criminal justice system was disqualifying in and of itself."  The defendant intimates that the judge's questioning and dismissal of juror no. 92 here evinced a lack of good faith that began after the prospective juror disclosed, earlier during voir dire, that she volunteered to support an organization that helped plant gardens in prisons, and her view that she was "very serious about whom we incarcerate and for how long and what opportunities we give people for rehabilitation and re-entry."
            Although the judge ended the voir dire prematurely, the larger record shows that she made a good faith effort to determine whether juror no. 92 was qualified to serve.  We similarly reject the defendant's conclusory argument that the record supports reversal because the exclusion of juror no. 92 "was part of a larger pattern resulting from, at a minimum, prevalent implicit bias."
            [16] Juror no. 56 had previously been seated on the jury before realizing his unavailability.
            [17] In 2019, Yom Kippur fell on October 9.  The last day of the defendant's trial was October 16, 2019.
            [18] The parties disagree over the timeliness and sufficiency of the defendant's objections regarding these jurors.  However, given the nature of the defendant's claims and the fact that we discern no error here, we reach the merits without resolving this threshold issue.  See Commonwealth v. Brown, 451 Mass. 200, 204 n.3 (2008).
            [19] We reject the defendant's argument that the jurors' dismissal violated Williams, 481 Mass. at 453.  The jurors here were excused after bringing religious-based scheduling conflicts to the court's attention, not because of any specific viewpoint they espoused.
            [20] At trial, the officer explained that during the police investigation, a homicide detective had shown him some photographs and video surveillance footage in which the officer was able to identify the defendant.  At the Commonwealth's request, the judge then admitted copies of these photographs, in addition to surveillance footage taken approximately two hours before the shooting, and the prosecutor had the officer identify the defendant in the photographs and video footage before the jury.
            [21] The judge also found that the defendant was wearing sunglasses in some of the images.  After careful review of the video exhibits and related stills, although it does not appear that the defendant was wearing sunglasses, there is an observable shadow from the brim of the defendant's baseball cap partially obscuring his eyes that the judge may have mistaken for sunglasses and, in any event, further supports the judge's finding that the officer's testimony would be helpful.
            [22] In assessing the quality of the video footage, the judge found that it was clear with respect to certain facial characteristics, but that "[s]ize, body shape, gait and body movement are not so clear that one lacking any familiarity of the person depicted would be able to identify the person depicted."  Cf. Pleas, 49 Mass. App. Ct. at 325 (image quality not "so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification" [citation omitted]).
            [23] We agree with the defendant that he is entitled to explore how the officer came to his video identification, and trial counsel did so in her vigorous cross-examination of the officer, both on voir dire and before the jury.  See Commonwealth v. Dougan, 377 Mass. 303, 317 (1979) (defendant entitled to voir dire "at which all the circumstances surrounding the pretrial identification of [the defendant] can be developed").  However, we decline the defendant's request -- made for the first time on appeal -- to create a rule categorically prohibiting such lay opinion testimony if the witness does not adhere to particular protocols.  Any weaknesses relating to the basis of the witness's familiarity and how the witness came to identify the defendant are generally matters for the jury to resolve.  Cf. Brum, 492 Mass. at 594 (evidence that "calls into question the 'accuracy and reliability' of a witness's identification . . . is a matter for the jury to resolve, not the judge" [citation omitted]).
            [24] In fact, one of the contacts this officer had had with the defendant was during an arrest of the defendant for an unrelated charge in early January 2015, resulting in the defendant's incarceration from the date of arrest until June 20, 2016.  Aware of this fact, the judge had precluded the Commonwealth from eliciting testimony regarding that arrest.
            [25] On appeal, the defendant concedes that the officer did not perjure himself before the jury.
            [26] Trial counsel cited Commonwealth v. Ware, 482 Mass. 717, 725 (2019), where we stated that, in instances of "blatantly false testimony central to the prosecution's case," it is the prosecutor's duty to "correct" the falsity in the testimony.
            [27] We similarly disagree with the defendant's argument that the prosecutor improperly rehabilitated his witness during voir dire by asking whether the witness was aware that the defendant had been in custody during the time period of early January 2015 until June 2016.  The prosecutor was permitted to explore whether the witness in fact committed perjury based on trial counsel's allegation.  Cf. Commonwealth v. Marrero, 427 Mass. 65, 69 (1998), S.C., 493 Mass. 338 (2024) ("The purpose of redirect examination is to explain or rebut adverse testimony or inferences developed during cross-examination" [citation omitted]).